1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JOSE GONZALEZ,                          No.  1:16-cv-01891-DAD-JLT

12              Plaintiff,

13        v.                                 ORDER DENYING PRELIMINARY
                                             APPROVAL OF CLASS ACTION
14   CORECIVIC OF TENNESSEE, LLC and         SETTLEMENT
     CORECIVIC, INC.,
15                                           (Doc. Nos. 30, 40)
                Defendants.
16

17

18        This matter comes before the court on plaintiff's unopposed motion for preliminary

19   approval of a class action settlement.  Plaintiff filed the motion on April 13, 2018.  (Doc. No. 30.)

20   A hearing was held on the matter on May 15, 2018, with attorneys Peter Dion-Kindem and

21   Lonnie Blanchard appearing on behalf of plaintiff and the putative class, and attorney Paul

22   Gleason appearing on behalf of defendants.  (Doc. No. 33.)  Following the hearing, the court

23   issued a minute order on May 16, 2018 directing the parties to filed supplemental briefing within

24   30 days addressing several specified topics.  (Doc. No. 34.)  Plaintiff timely filed this

25   supplemental brief on June 15, 2018.  (Doc. No. 40.)  For the reasons discussed below, the court

26   denies preliminary approval of this class action settlement.

27   /////

28   /////

1

This case concerns various wage-and-hour claims brought on behalf of prison guards and other workers at several of defendants' private prison facilities. Plaintiff moves for this court's approval of a global settlement resolving claims brought in both this lawsuit and another action pending before this court, *Richards v. CoreCivic of Tennessee, LLC*, No. 1:17-cv-01094-LJO-JLT.

Plaintiff alleges he was a corrections officer at defendants' privately-operated California City Correctional Center from April 2011 to November 23, 2013, at which point he was laid off when the operations of the facility were transferred to the State of California. (Doc. No. 1 at 18–19.) Plaintiff alleges class members were required to pass through three different security gates and undergo significant screening, as well as check in with shift supervisors, all prior to being permitted to clock in at work. (Doc. No. 1 at 22–23.) Similarly, when leaving at the end of their shift, class members were required to clock out prior to going back through the three security gates. (*Id.* at 23.) According to plaintiff., this process took approximately 10 to 15 minutes before a shift, and 10 minutes after each shift. (*Id.*) Because of this, the defendants allegedly failed to appropriately pay class members both the minimum wage and overtime. (*Id.* at 23–24.)

Additionally, the complaint alleges that plaintiff and other class members were not permitted to leave their posts for meal or rest breaks, except to quickly go to the bathroom. (*Id.* at 25–26.) Because class members regularly worked more than 10 hours in a shift, they were frequently entitled to at least two meal breaks on numerous shifts, which were not provided to them. (*Id.* at 26.) Similarly, class members were not permitted to take rest breaks, though frequently they worked shifts of more than 10 hours, which would typically afford them three rest breaks. (*Id.* at 27.) Plaintiff also seeks accompanying waiting time penalties and damages for unfair business practices. (*Id.* at 27–29.)

## LEGAL STANDARD

### 1.   *Rule 23 Settlements*

Rule 23 mandates that, "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P.

23(e).  The following procedures apply to the court's review of the proposed settlement:

> The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
>
> If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
>
> The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.
>
> . . .
>
> Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

*Id.*

"Courts have long recognized that settlement class actions present unique due process concerns for absent class members." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (citation and internal quotations omitted).  To protect the rights of absent class members, Rule 23(e) requires that the court approve all class action settlements "only after a hearing and on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2); *Bluetooth*, 654 F.3d at 946.  However, when parties seek approval of a settlement agreement negotiated prior to formal class certification, "there is an even greater potential for a breach of fiduciary duty owed the class during settlement." *Bluetooth*, 654 F.3d at 946.  Thus, the court must review such agreements with "a more probing inquiry" for evidence of collusion or other conflicts of interest than what is normally required under the Federal Rules. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *see also Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012).

Review of a proposed class action settlement ordinarily proceeds in three stages. *See* MANUAL FOR COMPLEX LITIGATION (4th) § 21.632.  First, the court conducts a preliminary fairness evaluation and, if applicable, considers class certification.  Second, if the court makes a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms, the parties are directed to prepare the notice of certification and proposed settlement to the class members. *Id.* (noting that if the parties move for both class certification and preliminary

approval, the certification hearing and preliminary fairness evaluation can usually be combined).

Third, the court holds a final fairness hearing to determine whether to approve the settlement. *Id.*; *see also Narouz v. Charter Commc'ns, LLC*, 591 F.3d 1261, 1266–67 (9th Cir. 2010). Though Rule 23 does not explicitly provide for such a procedure, federal courts generally find preliminary approval of settlement and notice to the proposed class appropriate if the proposed settlement "appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval." *Lounibos v. Keypoint Gov't Sols. Inc.*, No. 12-cv-00636-JST, 2014 WL 558675, at *5 (N.D. Cal. Feb. 10, 2014) (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)); *see also* NEWBERG ON CLASS ACTIONS § 13:13 (5th ed. 2011); *Dearaujo v. Regis Corp.*, Nos. 2:14-cv-01408-KJM-AC, 2:14-cv-01411-KJM-AC, 2016 WL 3549473 (E.D. Cal. June 30, 2016) ("Rule 23 provides no guidance, and actually foresees no procedure, but federal courts have generally adopted [the process of preliminarily certifying a settlement class]."). While it is not a court's province to "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute," a court should weigh, among other factors, the strength of a plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the extent of discovery completed; and the value of the settlement offer. *Chem. Bank v. City of Seattle*, 955 F.2d 1268, 1291 (9th Cir. 1992); *see also Officers for Justice v. Civil Serv. Comm'n of City & Cty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982).

### 2.    *FLSA Settlements*

"The FLSA establishes federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 69 (2013). Because an employee cannot waive claims under the FLSA, they may not be settled without supervision of either the Secretary of Labor or a district court. *See Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981); *Beidleman v. City of Modesto*, No. 1:16–cv–01100–DAD–SKO, 2018 WL 1305713, at *1 (E.D. Cal. Mar. 13, 2018); *Yue Zhou v. Wang's Rest.*, No. 05–cv–0279 PVT, 2007 WL 2298046, at *1 n.1 (N.D. Cal. Aug. 8, 2007). Employees

4

may bring collective actions under the FLSA, representing all "similarly situated" employees, but "each employee [must] opt-in to the suit by filing a consent to sue with the district court." *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1064 (9th Cir. 2000); *see also Jones v. Agilysys, Inc.*, No. C 12–03516 SBA, 2014 WL 108420, at *2 (N.D. Cal. Jan. 10, 2014).

The Ninth Circuit has not established criteria for district courts to consider in determining whether an FLSA settlement should be approved. *Dunn v. Teachers Ins. & Annuity Ass'n of Am.*, No. 13-CV-05456-HSG, 2016 WL 153266, at *3 (N.D. Cal. Jan. 13, 2016). However, district courts in this circuit have frequently applied a widely-used standard adopted by the Eleventh Circuit, which looks to whether the settlement is a fair and reasonable resolution of a bona fide dispute. *Id.*; *see also Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1352–53 (11th Cir. 1982); *Selk v. Pioneers Mem'l Healthcare Dist.*, 159 F. Supp. 3d 1164, 1172 (S.D. Cal. 2016); *Nen Thio v. Genji, LLC*, 14 F. Supp. 3d 1324, 1333 (N.D. Cal. 2014); *Yue Zhou*, 2007 WL 2298046, at *1. "A bona fide dispute exists when there are legitimate questions about the existence and extent of Defendant's FLSA liability." *Selk*, 159 F. Supp. 3d at 1172 (internal quotation marks and citation omitted). A court will not approve a settlement of an action in which there is certainty that the FLSA entitles plaintiffs to the compensation they seek, because doing so would shield employers from the full cost of complying with the statute. *Id.*

Once it is established that there is a bona fide dispute, courts often apply the Rule 23 factors for assessing proposed class action settlements when evaluating the fairness of an FLSA settlement, while recognizing that some of those factors do not apply because of the inherent differences between class actions and FLSA actions. *Khanna v. Inter-Con Sec. Sys., Inc.*, No. CIV S-09-2214 KJM, 2013 WL 1193485, at *2 (E.D. Cal. Mar. 22, 2013). To determine whether the proposed FLSA settlement is fair, adequate, and reasonable, courts in this circuit have balanced factors such as:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Khanna v. Intercon Sec. Sys., Inc.*, No. 2:09-CV-2214 KJM EFB, 2014 WL 1379861, at *6 (E.D. Cal. Apr. 8, 2014), *order corrected*, 2015 WL 925707 (E.D. Cal. Mar. 3, 2015); *see also Almodova v. City & County of Honolulu*, Civil No. 07–00378 DAE–LEK, 2010 WL 1372298, at *4 (D. Haw. Mar. 31, 2010), *recommendations adopted by* 2010 WL 1644971 (D. Haw. Apr. 20, 2010) (adopting class action settlement factors in evaluating a FLSA collective action settlement even though some of those factors will not apply). District courts in this circuit have also taken note of the "unique importance of the substantive labor rights involved" in settling FLSA actions and adopted a "totality of circumstances approach that emphasizes the context of the case." *Selk*, 159 F. Supp. 3d at 1173. With this approach, a "district court must ultimately be satisfied that the settlement's overall effect is to vindicate, rather than frustrate, the purposes of the FLSA." *Id*. Following this approach, the district court's "[o]bligation is not to act as caretaker but as gatekeeper," so that FLSA "settlements do not undermine the Act's purposes." *Goodwin v. Citywide Home Loans, Inc.*, No. SACV 14–866–JLS (JCGx), 2015 WL 12868143, at *2 (C.D. Cal. Nov. 2, 2015) (quoting *Goudie v. Cable Commc'ns, Inc.*, No. CV 08-507-AC, 2009 WL 88336 at *1 (D. Or. Jan. 12, 2009)). Settlements that reflect a fair and reasonable compromise of issues that are actually in dispute may be approved to promote the efficiency of encouraging settlement of litigation. *McKeen-Chaplin v. Franklin Am. Mortg. Co.*, No. C 10-5243 SBA, 2012 WL 6629608, at *2 (N.D. Cal. Dec. 19, 2012).

As recognized by the Ninth Circuit, some district courts within this circuit have questioned the propriety of allowing an FLSA collective action to proceed in the same case as a Rule 23 class action. *See Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1093 (9th Cir. 2011) (noting that the question of whether a Rule 23 class action can "co-exist with a related collective action under the FLSA . . . has divided district courts in our circuit"); *Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 471–73 (E.D. Cal. 2010) (collecting cases). Nevertheless, other district courts have allowed hybrid FLSA / Rule 23 actions to proceed to settlement, particularly where the funds and claims are treated separately. *See, e.g.*, *Thompson v. Costco Wholesale Corp.*, No. 14-cv-2778-CAB-WVG, 2017 WL 697895, at *8 (S.D. Cal. Feb. 22, 2017) (noting that "courts that have approved settlements releasing both FLSA and Rule 23 claims generally do so only

when the parties expressly allocate settlement payments to FLSA claims"); *Millan v. Cascade Water Servs., Inc.*, No. 1:12-cv-01821-AWI-EPG, 2016 WL 3077710, at *1–2 (E.D. Cal. May 31, 2016); *Moore v. Fitness Int'l, LLC*, No. 3:12–CV–1551–LAB–NLS, 2013 WL 3189080, at *8, n.6 (S.D. Cal. June 21, 2013) (observing that the FLSA does not permit collective claims brought under it to be treated in the same manner as a class under Rule 23).

**ANALYSIS**

As will be discussed below, the proposed settlement in this case suffers from several deficiencies. Moreover, because of the lack of clarity surrounding the value of the claims alleged in this action, the court cannot meaningfully review the substantive fairness of the settlement. For these reasons, the court cannot grant preliminary approval of the proposed class settlement. There is no one issue which compels the court to reach this decision. Rather, the numerous considerations set forth below lead the court to this conclusion.

*1. Inclusion of FLSA Claims is Improper Here*

Numerous aspects of plaintiff's proposed inclusion of FLSA claims in this settlement concern the court. First, neither plaintiff in either of the settling cases here has alleged an FLSA claim. Indeed, the inclusion of an FLSA claim in this case only arose after the court observed at oral argument on the pending motion that the settlement agreed to release FLSA claims, even though none had been alleged in the complaints. Thereafter, seemingly to support the settlement agreement's waiver of FLSA claims, plaintiff's counsel orally requested permission at the hearing to amend the complaint to add a FLSA claim for purposes of settling it. The parties have since lodged a proposed first amended complaint as an exhibit to their amended settlement agreement in which a FLSA claim is alleged for the first time. (Doc. No. 40-1 at 56–72.)

In the court's view, this approach raises red flags in large part because it appears plaintiff agreed to settle the FLSA claim before he ever considered litigating it. Therefore, the court directed plaintiff to file supplemental briefing addressing "how amending the complaint to include FLSA claims would resolve the issue of waiver of FLSA claims, without separate compensation being negotiated as part of the parties' settlement for the value of those claims." (Doc. No. 34.) In the subsequently filed supplemental briefing, plaintiff explains that the parties

have now agreed to amend the settlement agreement to designate $100,000 of the settlement as representative of the damages for the FLSA claims. (Doc. No. 40 at 10–12.) To be clear, this amount is simply designated and set aside from the already agreed-to total settlement amount; plaintiff did not negotiate an additional $100,000 in FLSA damages as part of the settlement. Plaintiff explains this amount "is reasonable given that the FLSA claims being released are a much smaller subset of, duplicative of and fundamentally subsumed by the California state law claims being released." (*Id.* at 11.) This statement highlights significant issues with plaintiff's approach to the FLSA claims and is at least suggestive of possible collusion between the settling parties.

Plaintiff's approach to settling the FLSA claims here is apparently premised on the assumption that a single plaintiff cannot recover for violations of both the FLSA and state wage-and-hour laws, because the former are duplicative of and "fundamentally subsumed" by the latter. District courts in the Ninth Circuit, however, have held the opposite in concluding the FLSA does not pre-empt state law wage claims and that a plaintiff may recover damages under each statute separately. *See Carillo v. Schneider Logistics, Inc.*, No. CV 11-8557 CAS (DTBx), 2013 WL 12124123, at *5–6 (C.D. Cal. May 13, 2013) ("[S]tate laws providing rights duplicative of existing rights under the FLSA in no way conflict with congressional purpose, and are not preempted."); *Ulin v. Lovell's Antique Gallery*, No. C-09-03160 EDL, 2011 WL 13153112, at *1–2 (N.D. Cal. Aug. 19, 2011) (denying a motion to alter or amend judgment based on the assertion that the plaintiff received duplicative recovery by recovering under both state labor law and the FLSA); *Valencia v. Del Rio West Pallet Co. Inc.*, No. CIV. S–09–1228 FCD EFB, 2009 WL 2407400, at *1 (E.D. Cal. Aug. 4, 2009) (noting that FLSA and state law overtime claims are not duplicative of one another for multiple reasons, including because the FLSA provides for the award of liquidated damages while state law does not); *see also Tegtmeier v. PJ Iowa, L.C.*, 189 F. Supp. 3d 811, 818 (S.D. Iowa 2016) (distinguishing between "parallel claims" and "duplicative claims," and noting the former exist where the legal right is independent of the FLSA, though it applies identical standards, while the latter "occur where state law offers a cause of action that allows a plaintiff to vindicate substantive rights conferred by federal law"). To be sure, this is not

8

a fully settled area of the law: some courts have concluded the FLSA does pre-empt at least certain state wage statutes, *see Bell v. 1220 Mgmt. Grp., LLC*, No. 17-cv-22479, 2018 WL 3054795, at *2 (S.D. Fla. June 20, 2018), while others have concluded that, although state wage claims are not pre-empted, the plaintiff must choose between duplicative recoveries, *see Rukavitsyn v. Sokolov Dental Labs., Inc.*, No. 2:12–cv–02253–JAR, 2012 WL 3066578, at *6 (D. Kan. July 27, 2012). However, this divergence of opinion among courts demonstrates there is room for argument. The law is not so clear—or at the least, this court has been cited no authority establishing its clarity on this point—that plaintiff can readily say these damages are duplicative and would not be awardable if litigated.

It may well be that plaintiff did not originally allege FLSA claims in this action because he believed they lacked worth. Indeed, in the supplemental briefing, plaintiff notes that the central wage-and-hour claim alleged in the operative complaint concerns plaintiff being forced to undergo security screenings prior to clocking in and after clocking out. (Doc. No. 40 at 11.) While such claims are arguably compensable under state law, plaintiff notes the Supreme Court has held that "time spent going through security measures [is] not compensable 'hours worked' under federal law." (*Id.*) Therefore, according to plaintiff, "the damage value of the FLSA claims related to the hours worked for the Security Measures Claims, if any, is at least non-existent and at best completely subsumed by the damage value of the California state law claims." (*Id.* at 11–12.) While the second part of that statement is not clearly true, the court accepts plaintiff's stated belief that there was no value to any FLSA claims.[1] However, this would suggest that the $100,000 the parties designated for payment of FLSA claims is entirely arbitrary.

These atypical circumstances create a potentially indelible stain for the settlement agreement as drafted, because they point toward collusion between the parties. Again, the first reference to FLSA claims in this litigation was in the waiver set forth in the original settlement

---

[1] In *Integrity Staffing Solutions, Inc. v. Busk*, ___ U.S. ___, ___, 135 S. Ct. 513 (2014), the Supreme Court held that anti-theft security screening procedures for packers in an Amazon warehouse were not "integral and indispensable to the principal activities that an employee is employed to perform," and were therefore not compensable under the FLSA. *Integrity Staffing Sols., Inc.*, 135 S. Ct. at 519. Whether this holding is distinguishable from any issue presented in this case is not a question the court must resolve at this time.

1    agreement. Plaintiff did not allege FLSA claims and only requested leave to amend the complaint

2    when questioned at oral argument about the propriety of settling claims he had not alleged.

3    Plaintiff then set an apparently arbitrary value for those new claims that did not increase the

4    overall amount of the settlement. In doing so, plaintiff explained that these claims were

5    duplicative and could not be recovered upon for that reason, despite significant authority

6    suggesting otherwise. This sequence of events raises a substantial concern on the part of the court

7    that it was defendants who insisted these claims be included as part of this settlement, and

8    plaintiff merely acquiesced to this request because he never intended to litigate the FLSA claims.

9         Moreover, plaintiff's explanation that the FLSA claims were meritless on their face

10   essentially confirms the inference that it was defendants who insisted on their inclusion in the

11   waiver. This explanation highlights why these claims are inappropriate to include in the

12   settlement of this case. If plaintiff believed such claims so lacked merit and worth that they

13   should not even be alleged, plaintiff could not possibly represent the best interests of any class

14   members who might be eligible to participate in a FLSA settlement. Moreover, amending a

15   complaint to add a claim that plaintiff believes is meritless and has a "non-existent" value may

16   violate Rule 11. *See* Fed. R. Civ. P. 11(b)(2) (noting legal contentions must be "warranted by

17   existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or

18   for establishing new law"). In any event, it is apparent the court cannot approve any FLSA

19   settlement here because there appears to be no bona fide dispute about FLSA liability: instead,

20   plaintiff effectively concedes defendant is not liable under the FLSA. Without a bona fide

21   dispute about FLSA liability, the court cannot approve a settlement of those claims. *See Lynn's*

22   *Food Stores, Inc.*, 679 F.2d at 1352–53; *Selk*, 159 F. Supp. 3d at 1172; *Nen Thio*, 14 F. Supp. 3d

23   at 1333; *Yue Zhou*, 2007 WL 2298046, at *1.

24        Even if the court were to attempt to construe plaintiff's representations as stating a bona

25   fide dispute does exist, plaintiff has not supplied the court any information about what the

26   potential damages for the FLSA claims are or whether liquidated damages were awardable.[2] It is

27

28   ---
     [2] As the Ninth Circuit has observed, under the FLSA, "[d]ouble damages are the norm; single
     damages the exception." *Haro v. City of Los Angeles*, 745 F.3d 1249, 1259 (9th Cir. 2014).

therefore impossible for the court to analyze whether the settlement amount is a fair and reasonable compromise of those claims. *See Khanna*, 2013 WL 1193485, at *2; *McKeen-Chaplin*, 2012 WL 6629608, at *2. In short, the inclusion of FLSA claims in this settlement militates against approval.

### 2. *Valuation of the Settlement*

Separate and apart from the apparently arbitrary value assigned to plaintiff's new FLSA claim, the court's analysis is further stymied by issues related to the valuation of the other claims alleged by plaintiff, particularly the PAGA claims.

#### a. Valuation of the PAGA Claims

The total proposed settlement here is for $3,002,606.46, with an estimated $1,699,606.46 to be distributed amongst 1,076 class members. (Doc. No. 30-4 at 7.) In calculating the maximum potential recovery for the class, plaintiff's counsel initially declared that the total potential recovery for the "hours worked" claim was approximately $4.5 million; the total value for the meal and rest break claims was approximately $9 million; and the total penalties sought under California Labor Code §§ 203 and 226(e) was approximately $2.2 million. (*Id.* at 9–10.) The total potential recovery initially reported by plaintiff's counsel was therefore approximately $15.7 million.[3] As discussed further below, plaintiff's counsel has since decreased their estimation of the value of this case. Nonetheless, using the original reported value, a settlement of approximately $3 million would represent a recovery of approximately 20 percent of the case's total potential value. While this is not a terribly high percentage, it is not outside the range of possible approval. *See, e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (finding a settlement for one-sixth of the value of the case to be fair and adequate); *Brown v. CVS Pharmacy, Inc.*, No. CV15–7631 PSG (PJWx), 2017 WL 3494297, at *4 (C.D. Cal. Apr. 24, 2017) (approving a settlement for approximately 27 percent of the possible recovery); *Glass v.*

---

[3] Confusingly, the pending motion suggested these figures were *only* for the members of Subclass 1, as it was originally constructed. (*See* Doc. No. 30-1 at 14) (noting these are the claims "for the class members at the Cal City and San Diego facilities"). The settlement subclasses have since been reformulated and are discussed further below, but counsel's estimated value of the claims remains unclear.

*UBS Fin. Servs., Inc.*, No. C-06-4068 MMC, 2007 WL 221862, at *4 (N.D. Cal. Jan. 26, 2007) (approving a settlement for approximately 25 to 35 percent of the potential recovery).

However, elsewhere in plaintiff's initial motion, class counsel indicated that "[p]laintiff's counsel has estimated potential PAGA [Private Attorneys General Act] exposure of over $36 million." (Doc. No. 30-1 at 32.) Though the operative complaint in this lawsuit does not allege PAGA claims,[4] it is clear PAGA penalties are a part of this case, because a portion of the settlement is specifically designated as a PAGA penalty. (*See* Doc. No. 30-4 at 34) (indicating that $300,000 of the settlement will be designated as PAGA penalties, and 75 percent of that, or $225,000, will go to the Labor and Workforce Development Agency ("LWDA")). Nonetheless, plaintiff's counsel did not apparently include the PAGA penalties in estimating the total value of the case. Doing so would have lowered the value of the settlement from approximately 20 percent to approximately 6 percent of the suit's total value. Because of this, on May 16, 2018, the court requested further briefing on the authority for the proposition that PAGA penalties should not be considered in the total estimated value of the class claims. (Doc. No. 34.) Plaintiff filed supplemental briefing on June 15, 2018 but addressed this point only to a limited extent.[5] (*See* Doc. No. 40 at 5–10.) There, plaintiff's counsel explains the initial estimated claims value of $36 million included the "stacking" of many potential PAGA penalties. (*Id.* at 9.) According to the supplemental briefing, this type of stacking "has frankly never been awarded by any Court in California in anything close to that kind of magnitude." (*Id.*) Plaintiff's counsel now estimates the "unstacked" value of the PAGA penalties to be $1.4 million if a penalty of $50 per pay period

---

[4] The motion for preliminary approval indicates that the *Richards* lawsuit sought PAGA penalties. (Doc. No. 30-1 at 10.) The docket in that case reflects that while the original complaint did not contain PAGA claims, an amended complaint filed on February 11, 2018 did add such a claim. *See Richards*, No. 1:17-cv-01094-LJO-JLT, Doc. No. 1 at 12–26; Doc. No. 25 at 1.

[5] The bulk of this supplemental briefing addressed the amount *set aside* under the parties' settlement as a PAGA penalty, and a comparison of the amount to that set-aside in other settlements. (*See* Doc. No. 40 at 5–9.) This analysis misapprehends the nature of the court's inquiry. The court is concerned that plaintiff's counsel failed to include the value of any PAGA claims in estimating the total value of this case for purposes of settlement. The court has yet to reach, and therefore has not yet developed any concerns over, the sufficiency of the percentage of the settlement fund designated as a PAGA penalty in this case.

were to be applied, $2.8 million if the penalty were $100 per pay period, and $4.2 million if the penalty were $150 per pay period.  (Doc. No. 40-1 at 5.)

The California Legislature enacted the PAGA in 2004 to address a chronic shortage of government resources to pursue enforcement of the California Labor Code.  *See Iskanian v. CLS Transp. L.A., LLC*, 59 Cal. 4th 348, 379 (2014).  The California Supreme Court explained the general framework of the PAGA as follows:

> Under this legislation, an "aggrieved employee" may bring a civil action personally and on behalf of other current or former employees to recover civil penalties for Labor Code violations.  (Lab. Code, § 2699, subd. (a).)  Of the civil penalties recovered, 75 percent goes to the Labor and Workforce Development Agency, leaving the remaining 25 percent for the "aggrieved employees."  (*Id.*, § 2699, subd. (i).)

*Id.* at 380 (quoting *Arias v. Superior Court*, 46 Cal. 4th 969, 980–81 (2009)).  In a PAGA action, the state is the real party in interest, and the action is "fundamentally a law enforcement action designed to protect the public and not to benefit private parties."  *Id.* at 387 (quoting *Arias*, 46 Cal. 4th at 986).  A PAGA plaintiff thus has "the same legal right and interest as state labor law enforcement agencies" and the action "functions as a substitute for an action brought by the government itself."  *Id.* (quoting *Arias*, 46 Cal. 4th at 986); *see also Culley v. Lincare Inc.*, 236 F. Supp. 3d 1184, 1191 (E.D. Cal. 2017) (observing that "PAGA allows employees to stand in the shoes of the LWDA and recover civil penalties for labor code violations").

While the damages awarded under PAGA do not inure entirely to the benefit of the class, courts have held that the full amount of the awardable penalties should be considered in establishing the fairness of the settlement.  "Just because the State would receive [seventy-five percent of the penalty] doesn't mean it's not part of the penalty.  To the contrary, a PAGA plaintiff stands in the shoes of the State in enforcing its wage and hour laws."  *Cotter v. Lyft, Inc.*, 176 F. Supp. 3d 930, 942 (N.D. Cal. 2016).  "[I]t makes no sense to simply erase the State's portion of the recovery when estimating the maximum value of the claim."  *Id.*  A plaintiff bringing a representative PAGA action not only owes a duty to their "fellow aggrieved workers," but "also owes responsibility to the public at large; they act, as the statute's name suggests, as a private attorney general."  *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133–34 (N.D.

Cal. 2016) (rejecting a proposal to settle PAGA claims for $1 million where counsel previously valued them at over $1 billion); *see also Brown*,, 2017 WL 3494297, at *4 (including PAGA payments in evaluating the class's maximum potential recovery); *Viceral v. Mistras Grp., Inc.*, No. 15-cv-02198-EMC, 2016 WL 5907869, at *9 (N.D. Cal. Oct. 11, 2016) ("[W]hile the Court is mindful of the need to safeguard the statutory purposes of PAGA and to ensure that the parties do not use a PAGA claim as a mere bargaining chip, and while the Court would ordinarily be highly skeptical of a settlement that amounts to a tiny fraction of the value of the PAGA claim, under the unusual and peculiar circumstances of this case where Plaintiffs face a substantial risk of recovering nothing on either the PAGA or class claims, the Court concludes that the settlement of the PAGA claim is reasonable in the context of the settlement as a whole."); *Ceja-Corona v. CVS Pharmacy, Inc.*, No. 1:12-cv-01868-AWI-SAB, 2014 WL 5500948, at *9 n.2 (E.D. Cal. Oct. 30, 2014), *findings and recommendations withdrawn due to mootness*, 2014 WL 6607959.

Here, plaintiff's current valuation of the PAGA claims is a significant impediment to approving the settlement. The PAGA statute provides that, unless a penalty amount is specifically provided elsewhere in the Labor Code, "the civil penalty is one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation." Cal. Labor Code § 2699(f)(2). Plaintiff's counsel estimated PAGA penalties at a rate of $50 per pay period ($1.4 million), $100 per pay period ($2.8 million), and $150 per pay period ($4.2 million). (Doc. No. 40-1 at 5.) Plaintiff's counsel has omitted any calculation of PAGA penalties at the statutory rate, which is higher than the three they have offered. Because the statutory penalty is $200 per pay period, the court will assume that the unstacked value of the PAGA penalties is $5.6 million, or four times the rate calculated by counsel at $50 per pay period. Accepting this value, a settlement of $3 million would represent approximately 14 percent of the value of the case.

Moreover, these representations about the appropriateness of "stacking" merely compound the problem. If counsel did not believe stacked penalties could or would ever be realistically awarded, it is unclear why counsel initially represented to the court that the PAGA penalties were worth that much. Moreover, "stacking" PAGA penalties is not inappropriate under

14

California law and, therefore, there is no obvious reason to use "unstacked" calculations to estimate the value of the case. *See, e.g.*, *O'Connor v. Uber Techs., Inc.*, Nos. 13-cv-03826-EMC, 15-cv-00262-EMC, 2016 WL 3548370, at *7 (N.D. Cal. June 30, 2016) (noting that "[p]laintiffs ignore the potential for stacking of PAGA penalties" and therefore their estimate of PAGA penalties "does not appear to rest on an accurate foundation"); *Schiller v. David's Bridal, Inc.*, No. 1:10–cv–00616 AWI SKO, 2010 WL 2793650, at *6 (E.D. Cal. July 14, 2010) (noting that courts include stacked PAGA penalties in calculating the amount in controversy). Trial courts certainly do retain discretion concerning the amount of PAGA penalties to be awarded.[6] *See* Cal. Labor Code § 2699(e)(2) (noting "a court may award a lesser amount than the maximum civil penalty amount specified by this part if, based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory"). However, plaintiff has not adequately explained why, in attempting to set out the total potential value of the claims in this case, he both "unstacked" them and suggested they might only be worth a quarter of the statutory penalty.

Finally, even the various numbers provided by plaintiff still do not add up. Since stacked PAGA penalties are awardable, it is appropriate for the court's analysis to start with the assumption that they could be awarded in establishing the total value of the case. The operative complaint in this matter alleged three separate claims which could serve as the basis for PAGA penalties,[7] concerning a failure to provide appropriate meal periods or rest periods, and a failure

---

[6] That said, *some* award of PAGA penalties is mandatory and a trial court does not have discretion to refuse such penalties in their entirety. *See Moreno v. Autozone, Inc.*, No. C05-04432 MJJ, 2007 WL 1650942, at *3–4 (N.D. Cal. June 5, 2007); *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1210–11 (2008).

[7] Plaintiff also alleged claims for waiting time penalties pursuant to Labor Code § 203 and for violation of California's Business and Professions Code § 17203. (Doc. No. 1 at 16.) The PAGA by its terms excludes penalties for either of these claims. The former of these provisions specifically provides for a penalty, and therefore cannot provide the basis for imposition of further PAGA penalties. *See* Cal. Labor Code § 2699(f) (establishing a penalty for "all provisions of this code *except those for which a civil penalty is specifically provided*") (emphasis added). The latter of these provisions is not part of the Labor Code. *See* Cal. Labor Code § 2699(a) (authorizing citizen suits where a "provision *of this code* . . . provides for a civil penalty to be assessed and collected by the Labor and Workforce Development Agency") (emphasis added).

15

to pay for all hours worked.  (*See* Doc. No. 1 at 16.)  The court still cannot determine what plaintiff's counsel considered in estimating the stacked value of the PAGA penalties, since $36 million is not an obvious multiple of any of values plaintiff's counsel provided, nor is it an obvious multiple of the court's assumed unstacked value of $5.6 million.  Counsel has failed to provide an adequate explanation that reconciles these numbers.

A trial court's discretion to reduce PAGA penalties might be a reason to ultimately discount the value of PAGA claims, perhaps even significantly, in reaching a settlement.  However, before the court could exercise that discretion it would have to know the actual estimated values of the PAGA claims.  More critically, the court must be convinced that the plaintiff knows the value of the claims he proposes to settle and can adequately explain why he has discounted them in reaching that settlement.  The inconsistencies in the valuation of the PAGA penalties set forth above suggest either that plaintiff has not been entirely forthcoming or is unaware of the true value of the PAGA claims.  Either circumstance casts doubt on the basic fairness of the settlement.  The court is particularly concerned about plaintiff's downplaying of the originally-asserted value of these penalties in its more recent briefing.  The failure to adequately explain why PAGA penalties were not considered in the analysis of the total value of the suit and the subsequent failure to explain how even those later estimated penalties were calculated, forestalls the court from any real evaluation of the reasonableness of this settlement.

b.    Difference in Estimated Amounts

Additional concerns are raised by the fact that the estimated value of the substantive claims has changed throughout the briefing of the pending motion.  Plaintiff's counsel estimated the total value of the three claims alleged by plaintiff at $15.7 million in the initial motion for preliminary approval.  (Doc. No. 30-4 at 9–10.)  In a supplemental declaration, counsel now states the total estimated value of those claims at $15.1 million.  (Doc. No. 40-1 at 3.)  Counsel does not explain why the estimated value of the claims differs by $600,000, which is equal to 20 percent of the settlement's value and 4 percent of the value of the estimated claims.  Though this might be inconsequential if adequately explained, this downward variance reinforces the court's concerns.  Should plaintiff again seek approval of a settlement in this matter, counsel is strongly

encouraged to show their work.

### 3. *Existence of Other PAGA Suit and Opposition to Intervention*

A further wrinkle to this settlement is the existence of another suit expressly pursuing PAGA claims that is currently pending in San Diego County Superior Court. As the parties and the court are aware, the plaintiff in that ongoing suit moved to intervene in this action as of right, asserting that only he had standing to bring PAGA claims related to the Labor Code violations alleged in these suits. (Doc. No. 39.) While the court denied that motion (*see* Doc. No. 47), the very existence of the other suit raises some additional concerns regarding the negotiated settlement in this case. The state court PAGA case was apparently filed on July 25, 2016. (Doc. No. 39-2 at 19.) That case predated the filing of this one by several months. (*See* Doc. No. 30-4 at 5) (noting this case was originally filed in the Kern County Superior Court on October 17, 2016). The parties to this lawsuit participated in a mediation on December 11, 2017, which did not result in a settlement. (*Id.* at 6.) Shortly thereafter, on January 5, 2018, the plaintiff in *Roberts* sought leave to amend to add a PAGA claim for the first time. *Roberts*, No. 1:17-cv-01094-LJO-JLT, Doc. No. 17. Defendants opposed the granting of leave to amend on the basis that the plaintiff in *Roberts* had not complied with the exhaustion requirements of PAGA. *Id.* at Doc. No. 19. Leave to amend was granted and a first amended complaint alleging PAGA claims was filed in *Roberts* on February 11, 2018. *See id.* at Doc. No. 25. A settlement was reached via subsequent private negotiations that continued following the parties' mediation (*see* Doc. No. 30-5 at 6), and though it is unclear when the settlement was reached in principal, a memorandum of understanding was signed on March 22, 2018. (*See* Doc. No. 28 at 2.)

The procedural posture of the addition of PAGA claims to this case paints a mixed picture. The fact that no party sought to add PAGA claims to this case until after the commencement of settlement negotiations and a full day mediation had been completed suggests the claims may have been added as part of a negotiating tactic, rather than out of a genuine intent to litigate them. This suggestion is enhanced by the inconsistencies in the value placed upon these claims, discussed above. However, because the motion to amend the complaint and add PAGA claims was contested, the court does not infer that the addition of the PAGA claims was a

collusive effort between the settling parties.

That said, the court is also mindful of the assertions made by the attempted intervenor in this case, Jose Gonzales. Although intervention was denied, the attempted intervenor did represent that the potential value of the PAGA penalties was more than $50 million, far exceeding even the highest value plaintiff's counsel here had originally placed on the claim, and much higher than the value now being ascribed to the PAGA penalties by plaintiff. (*See* Doc. No. 39-1 at 11.) While the court does not assume the attempted intervenor's estimates are necessarily accurate, the significant difference between the valuations raises the specter that PAGA penalties may have been included in this settlement as a bargaining chip, rather than as an earnestly-litigated claim.

> *4.    Overbroad Waiver*

Beyond the questionable inclusion of FLSA claims in this settlement, the waiver of claims in the amended agreement remains generally overbroad. Under the definition of "Released Claims," the settlement agreement recites:

> *All claims*, wage and hour claims, rights, demands, liabilities and causes of action *of any nature or description arising during the Settlement Class Period and* arising from the facts, theories of liability and claims asserted in or contemplated by the Actions and/or *the claims that could have been asserted based on the facts ascertained* or alleged *in the Actions*, including without limitation, any and all statutory, constitutional, contractual or common law claims for wages, damages, unpaid costs, penalties, liquidated damages, punitive damages, interest, attorneys' fees, litigation costs, restitution, and equitable or other relief based on the following categories: (a) any and all claims involving any alleged failure to pay the minimum wages required by state or federal law; (b) any and all claims arising under state or federal law involving any alleged failure to pay employees for all hours worked, including but not limited to any claim for minimum, straight time, or overtime wages; (c) any and all claims arising under state or federal law involving any alleged failure to pay overtime wages, including but not limited to any claim involving "off the clock" work, any claim involving payment of wages based on CoreCivic's defined workday or workweek, and any claim involving the failure to correctly calculate or include bonuses, other incentive pay, or compensation of any kind in the "regular rate" of pay; (d) any and all claims arising under state or federal law involving any alleged failure to properly provide meal periods and/or authorize and permit rest periods, to pay premiums for missed, late, short, unprovided, on-duty, or interrupted meal and/or rest periods, or to pay such premiums at the regular rate of compensation; (e) any and all claims

18

involving any alleged failure to keep accurate records or to issue proper wage statements to employees; (f) any and all claims involving any alleged failure to timely pay wages, including but not limited to any claim of violation of Labor Code §§ 201 or 202, and any claim for waiting time penalties under Labor Code § 203; (g) any and all claims involving any alleged failure to reimburse for necessary business expenses under Labor Code §§2800 or 2802, including but not limited to any claim for failure to provide and/or reimburse for uniform items and uniform maintenance; (h) any and all claims for unfair business practices in violation of Business and Professions Code sections 17200, et seq.; and (i) any and all penalties pursuant to the Private Attorneys General Act ("PAGA") of 2004 (collectively, the "Released Claims"). The Released Claims include, but are not limited to, all claims arising under the California Labor Code (including, but not limited to, sections 201, 201.3, 202, 203, 204, 210, 218.5, 218.6, 221, 225.5, 226, 226.3, 226.7, 227.3, 246, 256, 450, 510, 511, 512, 516, 558, 1174, 1174.5, 1182.12, 1194, 1194.2, 1197, 1197.1, 1197.2, 1198, 1199, 2800, 2802, 2698, 2699, 2699.3); the Wage Orders of the California Industrial Welfare Commission; California Business and Professions Code section 17200 et seq.; California Civil Code §§3336 and 3294; the California common law of contract; and federal common law. Members of the Settlement Class who opt-in to the Fair Labor Standards Act ("FLSA") claims portion of the Settlement expressly waive and release any FLSA claims, whether known or unknown, arising during the Settlement Class Period and reasonably related to the claims and allegations in the Action. The release excludes the release of claims not permitted by law.

(Doc. No. 40-1 at 14–15) (emphasis added).

Aspects of the opening language of this release appear at first glance to narrow its scope. (*See id.* at 14) ("All claims . . . arising during the Settlement Class Period *and* arising from the facts, theories of liability and claims asserted in or contemplated by the Actions and/or the claims that could have been asserted based on the facts ascertained or alleged in the Actions") (emphasis added). However, this same language sets the stage for the overbroad list of claims that follows, as it releases claims arising from the facts alleged as well as claims "that *could have been* asserted based on the facts *ascertained* . . . in the Actions." (*Id.*) (emphasis added). The release then lists claims that are included within that definition "without limitation." (*Id.*) This list includes many claims apparently unconnected to this case, such as "any claim involving the failure to correctly calculate or include bonuses, other incentive pay, or compensation of any kind in the 'regular rate' of pay." (*Id.*) The agreement also specifically releases "any and all claims involving any alleged failure to reimburse for necessary business expenses . . ., including but not limited to any

19

claim for failure to provide and/or reimburse for uniform items and uniform maintenance." (*Id.* at 15.)  Notably, plaintiff has never asserted in this action that defendants failed to include bonuses or incentives in calculating overtime or failed to reimburse for business expenses.  Certainly, no information has been presented to the court about the potential value of any such claims.  The court therefore assumes plaintiff and his counsel did not litigate or conduct discovery with respect to any such claims.

Beyond these obvious examples, the agreement also releases *all* claims under any provision of the California Labor Code, including 36 specifically delineated provisions, as well as other entire areas of law, such as "federal common law." (*Id.* at 14–15.)  Such a release is overbroad, even without a detailed analysis of every provision of the California Labor Code, since plaintiff only alleged three substantive claims in this action, one derivative claim under the California Business and Professions Code, and one claim for waiting time penalties.  While these release provisions might arguably be limited slightly by the language narrowing the released claims to those based on facts asserted in the complaint, the language expanding this definition to those "that could have been asserted based on the facts ascertained . . . in the Actions" renders that uncertain.  (*Id.* at 14.)

Aside from these overbreadth problems, the description of the claims released creates serious due process issues with respect to absent class members.  The court questions how an absent class member, who received none of the discovery in this case, would know what claims could be "based on . . . facts ascertained" in this case and therefore "could have been asserted" in this case, even though they were never alleged or litigated?  Without knowing what facts were ascertained during this case, an absent class member has no way of knowing what claims they are agreeing to release.  This raises significant due process concerns.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12 (1985) (holding that, to satisfy due process, notice "must be the best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections'") (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)); *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (noting the "unique due process concerns for absent class members"

and commenting that "the district court has a fiduciary duty to look after the interests of those absent class members") (quoting *Hanlon*, 150 F.3d at 1026); *Logan v. Hargraves*, No. CV-04-0214-FVS, 2008 WL 11425713, at *2 (E.D. Wash. Sept. 25, 2008) ("[W]here the terms of a settlement involve the release of claims, the settlement notice must clearly identify the claims being released."); *Bowman v. UBS Fin. Servs., Inc.*, No. C-04-3525 MMC, 2007 WL 1456037, at *1 (N.D. Cal. May 17, 2007) (observing due process requires that "the options available to class members and the consequences of their elections be detailed with sufficient clarity to afford absent members a realistic opportunity to evaluate alternative options available to them") (quoting *McCubbrey v. Boise Cascade Home & Land Corp.*, 71 F.R.D. 62 (N.D. Cal. 1976)).

In every settlement, it will be in defendants' interest to frame the release of claims as broadly as possible. Further, if the settlement is for a sufficient amount, plaintiff may be induced to acquiesce to an overly broad release of claims, since it releases claims plaintiff had no interest in litigating in any event. A release of claims that is as broadly drafted as the one in question here, however, cannot be approved by the court, where it does not reasonably track the allegations of the complaint. *See Kempen v. Matheson Tri-Gas, Inc.*, No. 15-cv-00660-HSG, 2016 WL 4073336, at *9 (N.D. Cal. Aug. 1, 2016) ("Courts in this district routinely reject proposed class action settlement agreements that try to release all claims in a wage-and-hour case relating to compensation as overbroad and improper."); *Boyd v. Avanquest N. Am. Inc.*, No. 12–cv–04391–WHO, 2015 WL 4396137, at *1 (N.D. Cal. July 17, 2015) (denying preliminary settlement approval because "there are 'obvious deficiencies' in the proposed Settlement Agreement," "namely, the overly broad release provision"); *McKeen-Chaplin v. Franklin Am. Morg. Co.*, No. C 10–5243 SBA, 2012 WL 6629608, at *5 (N.D. Cal. Dec. 19, 2012) (disapproving an FLSA settlement in part because the release provision did "not track the breadth of the allegations in this action and releases unrelated claims"); *Bond v. Ferguson Enters., Inc.*, No. 1:09–cv–01662 OWW MJS, 2011 WL 284962, 2011 WL 284962, at *7 (E.D. Cal. Jan. 25, 2011) (noting that the proposed release was overbroad because it did "not appropriately track the extent and breadth of Plaintiffs' allegations in this case and releases unrelated claims of any kind or nature that class members may have against defendants"); *see also Christensen v. Hillyard, Inc.*, No. 13–cv–04389

21

NC, 2014 WL 3749523, at *1 (N.D. Cal. July 30, 2014) (rejecting settlement approval because release of claims was "overly broad"); *Tijero v. Aaron Bros., Inc.*, No. C 10–01089 SBA, 2013 WL 60464, at *9 (N.D. Cal. Jan. 2, 2013) (same).[8]

Here, defendants sought a broad waiver from plaintiff, which included claims plaintiff did not allege, did not litigate, and did not believe had any value. Moreover, it would not be possible for absent class members to know the extent of the claims they are releasing, given the language of the settlement agreement. While plaintiff might not see a downside in waiving claims he had no interest in litigating, this is the sort of behavior about which reviewing courts must be vigilant, because it is suggestive of collusion. *See, e.g.*, *Belew v. Brink's, Inc.*, 721 Fed. App'x 734, 735 (9th Cir. 2018) ("One indication of collusion is an overbroad release of claims.")[9]; *Ambrosino v. Home Depot U.S.A., Inc.*, No. 11cv1319 L(MDD), 2014 WL 1671489, at *2 (S.D. Cal. Apr. 28, 2014) ("Courts have found that overly broad release provisions, which release a Defendant from all claims to settle their wage claims, including claims that are unrelated to the claims asserted in the complaint, are improper in FLSA and class action settlements."); *Adderley v. Nat'l Football League Players Ass'n*, No. C 07–00943 WHA, 2009 WL 4250786, at *2 (N.D. Cal. Nov. 23, 2009) (noting the settlement was approved only after numerous revisions of the release provision to narrow its scope); *see also Hendricks v. Starkist Co.*, No. 13-cv-00729-HSG, 2016 WL 692739, at *4 (N.D. Cal. Feb. 19, 2016) ("The Court found counsels' statements at the final fairness hearing further cause for concern. Counsels' repeated avowals that a conspiratorial-underfilling 'claim does not exist,' and that 'there wasn't evidence of it, [and] it wasn't brought up,' are hard to square with the final-hour amendment expressly requiring the class to release

---

[8] Similar concerns attend the release of FLSA claims. *See Selk*, 159 F. Supp. 3d at 1178 ("Courts review the scope of any release provision in a FLSA settlement to ensure that class members are not pressured into forfeiting claims, or waiving rights, unrelated to the litigation. The concern is that an expansive release of claims would effectively allow employers to use employee wages— wages that are guaranteed by statute—as a bargaining chip to extract valuable concessions from employees."); *see also Moreno v. Regions Bank*, 729 F. Supp. 2d 1346, 1352 (M.D. Fla. 2010) ("[A] pervasive release in an FLSA settlement confers an uncompensated, unevaluated, and unfair benefit on the employer.").

[9] Citation to this unpublished case is appropriate pursuant to Ninth Circuit Rule 36-3.

conspiratorial-underfilling claims.") (internal citations omitted).  Here, the overly broad release of claims that have not been litigated, alleged, or valued, and which class members cannot know the full extent of, is a deficiency that prevents the court from approving this settlement.

> 5.    *The Shifting and Inconsistent Class and Subclass Definitions*

Lastly, the court notes that the definition of the class and the subclasses in the initial settlement agreement was inconsistent, and that the definitions of the subclasses in the amended settlement agreement have now changed.  The operative complaint in this case alleges five different subclasses, all comprised of all non-exempt California employees of defendants:  (1) those who were not paid for time spent undergoing security checks; (2) those who worked more than eight hours a day or forty hours a week and were not paid overtime; (3) those who were not appropriately paid for meal breaks; (4) those who did not receive compliant rest breaks; and (5) those who were members of the other subclasses but left defendants' employment within three years of the complaint's filing.  (Doc. No. 1 at 19–20.)  Approval was initially sought for a class settlement that certified three separate subclasses:  (1) non-exempt employees in specified positions at the California City Correctional Facility, the San Diego Detention Center, and the Otay Mesa Detention Center; (2) non-exempt employees at the California City Correctional Facility and San Diego Detention Center who did not work in the positions specified in the first subclass; and (3) any non-exempt employees working at defendants' facilities located at 2727 Boston Avenue, San Diego, California or 551 South Street, San Diego, California.  (Doc. No. 30-1 at 11.)  This was potentially inconsistent with the overarching "Settlement Class," defined as "all non-exempt employees who were employed by Defendant in California at any time during the Settlement Class Period."  (*Id.*)  It is unclear how many facilities defendants operated in California during the class period, but the company's website suggests there are seven currently operating.  *See* CoreCivic, http://www.corecivic.com/facilities?state=CA&hs_name= (last visited Sept. 6, 2018).  If so, and since the subclasses covered only employees at five facilities, the overarching class may have covered individuals who were not part of any subclass.  Given the broad release language, those individuals would have released all labor law claims despite receiving no compensation from the settlement.

In response to the court's request for supplemental briefing about the formulation of the subclasses and division of settlement proceeds between them, the parties amended the settlement agreement. In doing so, they divided the class into four new subclasses: (1) all non-exempt employees in California; (2) all non-exempt employees at the California City Correctional Facility in certain specified positions "who executed an On Duty Meal Period Agreement"; (3) all non-exempt employees who worked at the California City Correctional Facility, San Diego Detention Center, or Otay Mesa Detention Center; and (4) all non-exempt employees who opt-in to the settlement and therefore release FLSA claims. (Doc. No. 40-1 at 22–23.) The overarching settlement class definition remains the same as in the initial settlement agreement. Thus, in the amended version of the settlement agreement, there is no inconsistency between the overarching class definition and the definitions of the subclasses, because Subclass 1 is coterminous with the overarching class definition. However, this amendment enlarged the proposed subclasses by apparently expanding the number of facilities and workers covered by the subclass definitions. Subclass 1 grew from an estimated 607 subclass members to an estimated 1,076 subclass members; Subclass 2 grew from 199 to 213 subclass members; and Subclass 3 grew from 336 to 806 members. (*Compare* Doc. No. 30-1 at 11 *with* Doc. No. 40-1 at 22–23.) It seems likely there is some overlap between the subclass definitions, and some individual employees may belong to more than one of the subclasses. However, the parties have not clearly explained how many total class members there are and what level of overlap, if any, there is between the subclasses. Should the parties attempt to seek approval of a new, revised settlement, the court strongly encourages them to be clear about the anticipated number of total class members, the breakdown of those class members into subclasses, and the reasons for subdividing the class members and awarding funds in the manner described.

> 5. *The Settlement Agreement Suffers from Deficiencies and Cannot Be Preliminarily Approved*

Class action settlements must be taken as a whole, and a district court is not free to evaluate the settlement agreement piecemeal. *See Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003) ("'It is the settlement taken as a whole, rather than the individual component parts, that

must be examined for overall fairness,' and '[t]he settlement must stand or fall in its entirety.'")

(quoting *Hanlon*, 150 F.3d at 1026); *Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1035 (N.D. Cal. 2016); *In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 583 (N.D. Cal. 2015). The Ninth Circuit has consistently instructed district courts to subject settlements negotiated prior to class certification to increased scrutiny. *See Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1079 (9th Cir. 2017) ("When, as here, a class settlement is negotiated prior to formal class certification, there is an increased risk that the named plaintiffs and class counsel will breach the fiduciary obligations they owe to the absent class members."); *Bluetooth*, 654 F.3d at 946–47 (noting that the court must review settlements negotiated prior to class certification for additional, subtle signs of collusion); *Hanlon*, 150 F.3d at 1026 ("The dangers of collusion between class counsel and the defendant, as well as the need for additional protections when the settlement is not negotiated by a court designated class representative, weigh in favor of a more probing inquiry than may normally be required under Rule 23(e)."); *see also Allen*, 787 F.3d at 1223–24 (noting that, while substantive review of a settlement is deferential, the Ninth Circuit holds "district courts to a higher *procedural* standard when making [the] determination of substantive fairness" and "[t]hat procedural burden is more strict when a settlement is negotiated absent class certification").

Considering the settlement in its totality here, the court cannot approve this settlement on even a preliminary basis. As explained above, the inclusion or attempted inclusion of FLSA claims in the settlement of this case is problematic in numerous ways: (1) such claims have never been alleged or litigated; (2) counsel appears to have written off any recovery under the FLSA based on the belief that it would be duplicative of the state law claims, even though no established authority has been cited demonstrating this to be the case; (3) counsel believes these claims are substantively meritless, but nonetheless proposes to add and settle them in this action; and (4) the value assigned to the claims is arbitrary, apparently because counsel believes they lack merit. Moreover, the late inclusion of these claims in the settlement agreement strongly suggests they were added only at defendants' insistence so that they would be covered in the broad release that has been proposed.

/////

In addition, plaintiff has offered contradictory and seemingly irreconcilable estimations of the PAGA penalties available for this case.  In attempting to explain why such penalties were not included in counsel's estimated valuation of the case, counsel has asserted that the PAGA penalties were actually of less value than previously identified.  Counsel then re-estimated the PAGA penalties at an amount below the statutory rate for such penalties, without any adequate explanation for why they would be awarded at those lower rates.  (Doc. No. 40 at 10.)  Because it remains unclear to the court what PAGA penalties are potentially available in this case, the court cannot begin to meaningfully review the sufficiency of the settlement.   Additionally, plaintiff's counsel's highest estimated value for the PAGA claims is approximately $14 million less than the valuation presented by the proposed intervenor.  Though the court does not assume that the proposed intervenor's valuation of the PAGA claims is accurate, PAGA claims were only added to this case after a mediation session had taken place in this action and settlement talks were underway, suggesting they may have been added as a bargaining chip, rather than an earnestly-litigated claim.

Moreover, the release of claims in this case is overbroad.  It absolves defendants of liability not only for those claims which were brought or could have been brought based on the facts alleged in the complaint, but also all claims which could have been brought based on facts ascertained during the case.  This includes, without limitation, any and all claims under California's Labor Code, federal common law, and other areas of law.  It specifically includes claims that have no apparent relation to this case, such as claims related to the failure to include bonus pay in overtime calculations and the failure to reimburse for business expenses.  Because the waiver of claims applies to any claims based on facts ascertained in this suit, it forestalls absent class members—who have not been privy to the discovery produced in this action—from knowing what claims they are waiving.  This implicates significant due process concerns.

Finally, the valuation of the substantive claims alleged here has changed by more than a half-million dollars over the course of the briefing on the pending motion for preliminary approval.  This coincides with a redefinition of the subclasses involved in the settlement that appears to expand the number of facilities and employees covered.  These modifications—which

suggest that counsel's view of the case's value has gone down while the number of workers covered has gone up—have not been explained to the court's satisfaction. The formulation of the class and the subclasses, including the total members in each, any overlap between them, and the logic underlying the division of the subclasses in this manner, should be clearly explained in any subsequent attempts to settle this case.

The court will not forestall further efforts by the parties to settle this matter. *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (noting the "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned"); *Custom Led, LLC v. eBay, Inc.*, No. 12-cv-00350-JST, 2013 WL 4552789, at *9 (N.D. Cal. Aug. 27, 2013) (denying preliminary approval without prejudice). However, this settlement cannot be approved without significant amendment. Plaintiff's counsel should bear in mind that any further motions to approve a settlement should fully and completely address how plaintiff's counsel valued the claims alleged, how the release provisions reasonably track the allegations of the complaint, and explain why the settlement is fair and reasonable. This is particularly true if settlement approval is sought prior to class certification. Moreover, all counsel are advised that a subsequent settlement agreement which tracks the substance of those previously submitted—that is, one which releases essentially the same broad swath of claims for the same amount of money—will almost certainly not be approved. It appears to the court that counsel must substantively renegotiate this settlement (either in terms of the claims settled, the amount paid to the plaintiffs, or both) for it to pass muster.

## CONCLUSION

For the reasons given above, the motions for preliminary approval (Doc. Nos. 30 and 40) are denied without prejudice. This matter is referred back to the assigned magistrate judge for further scheduling.

IT IS SO ORDERED.

Dated:  __September 12, 2018__          _____

UNITED STATES DISTRICT JUDGE